**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **LINDA SIMMONS,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **5:05-CV-28 (WDO)** |
| | : | |
| **THE BOEING COMPANY,** | : | |
| | : | |
| **Defendant** | : | |

**ORDER**

Plaintiff Linda Simmons sued her former employer, Defendant Boeing, claiming she was denied a promotion because of her gender and age, over 40, and that she was retaliated against for filing complaints about the alleged discrimination.  The matter is now before the Court on Defendant's motion for summary judgment.

Except for a three-year layoff, Plaintiff has been employed by Defendant Boeing and its subsidiaries since 1980 in various Human Resources positions.  After working as a Level 4 Human Resources Generalist ("HRG") for a while, she worked for six months as Acting Manager of the group which made her eligible for a Level 5.  When Plaintiff was scheduled to go back to Level 4 after the temporary Acting Manager position was no longer available, Plaintiff's manager Deborah Bennett recommended that Plaintiff be officially promoted to a Level 5 so she would not lose the 10% salary increase she had been receiving.  Bennett's superior, Obie Jones, approved Plaintiff's promotion to a Level 5.

1

In the Spring of 2002, Plaintiff told a fellow employee, Randy Sheppard, that Bennett was considering moving Plaintiff to an "organization development role." Sheppard repeated this conversation to another employee, Wendy Wilson, who later told Plaintiff about the discussion. Plaintiff thereafter complained to Bennett that Wilson and Sheppard were gossiping about her. Plaintiff admits that this complaint did not pertain to any gender or age discrimination. Plaintiff later complained to Obie Jones about Wilson having a negative attitude toward Plaintiff. Plaintiff also admits that this complaint did not pertain to any gender or age discrimination. Plaintiff continued to have personal conflicts with Wilson and others in the department. Plaintiff believes this was because she complained about them gossiping about her while the other employees in the department stated they found Plaintiff to be negative, cold and unapproachable.

In 2002, Boeing decided to create a management position between Bennett and the HRGs and posted this position in BESS, the company's online application system. Bennett, who was the hiring manager for the position, encouraged Plaintiff to apply. The posting noted that the preferred candidate for the position would have a Bachelor's degree, 10 to 15 years in Human Resources experience and a certificate from the Society of Human Resources Management ("SHRM") would be considered a plus. Bennett had recently been diagnosed with multiple sclerosis and was out of the office during the time Boeing interviewed for the position. Obie Jones therefore asked for assistance from HR in Long Beach, California to review the resumes and determine which candidates should be interviewed. The Long Beach

2

office provided a list of candidates for Bennett to interview.  The list did not include Plaintiff because she did not have the preferred degree or the SHRM certificate.  However, upon her return from medical leave, Bennett added Plaintiff's name to the list of interview candidates.

Eleven candidates were interviewed in December 2002 either in person or by telephone.  The interview panel consisted of Bennett and several others.  Although Wendy Wilson was originally on the panel, Bennett substituted her with someone else because of Plaintiff's personal conflicts with Wilson.  Plaintiff was interviewed but was very nervous during the interview.  Plaintiff ranked 9th out of 11 candidates due to her lack of education and incomplete responses to the questions posed.  Boeing first offered the job to the highest ranking candidate, Carol Regan, a female who was over 40 years old and a former Boeing employee.  Regan declined the position.  Boeing then looked into the next two candidates, both male, but did not offer the job to them for various reasons.  The next candidate on the list was Joi Doi, a female, but when offered the position she also declined.  The next candidate in order of interview score was Darrell Holder who had initially interviewed by telephone.  Bennett then decided to personally interview Holder and two other individuals on the list.  Holder received the highest score of the three individuals interviewed - a 93 out of 100.  Plaintiff's score was 62.  Holder, who had previously worked at Boeing in Macon, had a master's degree, an SHRM certificate and seven years experience in HR.  Holder was offered and accepted the job and began in May of 2003.

For a while, Plaintiff served as a Team Leader in her department.  The Team Leader

position is not a management position nor does it involve additional pay.  The Team Leader's responsibility is to ensure that day-to-day assignments are distributed to the HRGs. Plaintiff's areas of responsibility were layoffs and compensation.  In February of 2003, Plaintiff voluntarily gave up the Team Leader role.  Bennett and Jones tried to convince Plaintiff to remain a Team Leader but Plaintiff insisted on giving up the position.  Bennett testified that after Plaintiff gave up her leadership role other HRGs complained to Bennett that Plaintiff had delegated most of her work to them and taken credit for much of the team's work.

Around the time Holder was hired as HR manager, Boeing decided on a company-wide basis to move away from designating HRGs as subject area experts to having each HRG support assigned internal "customers."  These customers were actually heads of departments at the Boeing facilities.  Boeing also designated "Centers for Excellence" which assumed some of the other specialized tasks previously performed by the HRGs.  Holder also took over the employee cash award programs and layoff management from Plaintiff.  Plaintiff claims that Holder taking over these responsibilities was discriminatory retaliation against her based on Plaintiff's complaints that Holder was selected instead of her.  Holder took over many responsibilities the HRGs had when he became a manager because those functions were previously handled by the HRGs due to the absence of a manager between the HRGs and Bennett.

Holder prepared Plaintiff's performance evaluation for 2003 with input from Bennett.

4

Plaintiff received an overall evaluation of "met most expectations."  In the past, Plaintiff's evaluations that were higher had been based in part on the performance of her team as a whole and this was the first time Plaintiff was evaluated by Holder and the evaluation was based solely on her individual performance.  Since Plaintiff was a Level 5, her position also required a higher level of competency and skills than the other HRG positions who were Level 4s.  Holder testified that part of her evaluation was also based on Plaintiff's co-workers complaining about working with Plaintiff because Plaintiff comes across to others as negative, cold and standoffish.  Although Plaintiff denies this, her only basis for the denial is that she did not *know* others had complained about her.

The review noted that Plaintiff needed to improve in the areas of communication, technical skills, customer skills, working with others and leadership.  Holder noted that Plaintiff needed to become more approachable by team members and customers and to learn to accept opposing positions without taking it personally.  He also noted that Plaintiff needed to improve her technical skills and ability with the computer and needed to become more of a team player.  Plaintiff claims the score should have been the same as her previous scores because she was "given no reason" for the 2003 evaluation to have been any different.  Holder testified that when he reviewed the evaluation with Plaintiff, she became very angry, yelled at him and pointed her finger in Holder's face.  Plaintiff admits that she did not believe she should be supervised by Holder and made that clear to Holder and Bennett.  This was also apparent in the numerous emails between Holder and Plaintiff, many of which have been

5

placed in the record.

After her performance evaluation, Plaintiff received a salary increase in 2004 of $2,207, raising her salary from $73,564 to $75,771. At the time, she was making more than Holder and the other HRGs were paid $49,420 to $58,064. Plaintiff's salary increase was higher than the increases given to two of the other HRGs supervised by Holder and a few hundred dollars less than the increases given to the other two HRGs. Plaintiff complained about her salary increase because it was a lower percentage increase than that received by the other HRGs. Holder explained that he had a pool of money from which to give the salary increases and distributed the increases based on the employees' performances and current salaries.

During the time that Boeing was investigating Plaintiff's complaints, Plaintiff complained that she did not have sufficient privacy to perform her HR work that often involved sensitive, confidential information about other employees. Because there was no existing location into which Plaintiff could move, Boeing built a mobile unit near the building where Plaintiff's customers were located in Building One. Plaintiff, HRG Stephanie Brock and Security Manager Bill Roulette moved to the new location in April of 2003. Brock soon complained to Bennett and Holder that Plaintiff created an uncomfortable environment in the office. Brock stated that Plaintiff constantly complained about Boeing and Plaintiff's managers and that Plaintiff constantly questioned her about documents on Brock's desk and telephone conversations Brock had with others. After Brock's customers

continued to complain that they did not want to meet in that office if Plaintiff was there, Brock moved into Building One when a space became available.

In May of 2003, Plaintiff filed an internal complaint that focused primarily on her dissatisfaction with the response to her complaints about Wilson gossiping, the selection of Holder for the HR manager position, her unhappiness with her office location and Holder's assumption of certain responsibilities that had previously been handled by Plaintiff. Plaintiff claimed that these matters were evidence of age and gender discrimination.

Although Plaintiff also claimed retaliation in that Holder allegedly scrutinized her work more closely than the other HRGs, she admits she has no idea to what extent Holder examined anyone else's work. Holder testified that he scrutinized all of the HRGs' work until he became confident they were handling their work competently and appropriately. On one particular assignment about which Plaintiff complains Holder scrutinized her she had turned in work that contained multiple errors such as forms that incorrectly calculated employees' salary increases. Plaintiff contends Holder's criticism of this was in retaliation for her complaints.

In addition to the above complaints, Plaintiff also alleges that Boeing retaliated against her for complaining about alleged discrimination in that she applied online for several positions at other facilities but was not hired. Plaintiff claims that the individuals at the other locations "must have" contacted Holder and received negative feedback about Plaintiff filing complaints. However, Plaintiff acknowledges that she does not actually know whether

anyone at any facility ever called Holder, Bennett or anyone else regarding her applications. Holder testified that he was never contacted by anyone about Plaintiff applying for any other positions. Plaintiff believes that several of those positions were canceled and removed from BESS after she filed complaints of discrimination but acknowledges that she has no information on when, why or by whom those positions were canceled. The three positions she pointed to specifically involved individuals being hired who were more qualified than Plaintiff: (1) Susan Bobo had a PCHR certification, a Bachelors degree and was involved with several industry liaison groups; (2) Peggy Agnew had extensive management experience, was already performing all the duties required for the new position in her then current position and had significant technical experience crucial to the position in question and (3) Carolyn Hansen had in-depth knowledge of the relevant processes as well as significant experience in the relevant areas.

Plaintiff filed her first charge of discrimination with the EEOC on September 17, 2003 and claimed she was not selected for the HR manager position because of her complaints about Wilson and alleged age and gender discrimination in Boeing's selection of Holder. Plaintiff's only evidence of discrimination is that Holder is male and younger, he is in his early 30s. Plaintiff also argues there is no logical reason for Boeing to have selected Holder over her and believes that Holder was preferred because he had been with the company in the past. Plaintiff thereafter filed another complaint about her performance review and the amount of her 2004 salary increase, claiming retaliation for the previous complaints.

After the EEOC notified Plaintiff it found no violation of Title VII, it issued a Dismissal and Notice of Right to Sue.  Plaintiff thereafter she filed her case in this Court alleging age and gender discrimination and retaliation.  The matter is now before the Court on Defendant Boeing's motion for summary judgment.  Defendant contends that Holder was selected because he was more qualified than Plaintiff Simmons and that Plaintiff's allegations of retaliation have no merit.

### *Standard of Review*

Summary Judgment is appropriate when the pleadings, depositions and affidavits submitted by the parties show no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The Supreme Court explained the moving party's burden may be discharged "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In Celotex, the Court held that summary judgment is appropriate against

> A party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23.  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.

The relevant rules of substantive law dictate the materiality of a disputed fact." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." Id. (citation omitted). "Summary judgment . . . is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (citing Fed. R. Civ. P. 1; Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984)).

### Gender and Age Discrimination

"Under both Title VII and the ADEA, a plaintiff may prove a claim of discrimination through (1) direct evidence, (2) circumstantial evidence, or (3) statistical proof." Apodaca v. Secretary of Dept. of Homeland Sec., 161 Fed. Appx. 897, 899 (11th Cir. 2006) (citing Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir.1990); Eskra v. Provident Life & Acc. Ins. Co., 125 F.3d 1406, 1411 (11th Cir.1997) (holding that when proving discriminatory treatment, the same analysis applies to ADEA cases as to Title VII cases)). "Direct evidence of discrimination is evidence, that, 'if believed, proves the existence of a fact in issue without inference or presumption.'" Vickers v. Federal Express Corp., 132 F. Supp.2d 1371, 1378 (S.D. Fla. 2000) (quoting Burrell v. Board of Trustees of Ga. Military College, 125 F.3d 1390, 1393 (11th Cir.1997)). Such evidence is generally comprised of

specific statements, conduct or attitudes by employment decision makers that reflect a bias or discriminatory animus toward a particular protected class. Plaintiff Simmons presented no direct evidence of any statements or other conduct by any Boeing employee that indicated Plaintiff was not promoted because of her age or gender. The Court must therefore determine whether Plaintiff presented circumstantial evidence of a prima facie case of age or gender discrimination.

To establish a prima facie case of discrimination for failure to promote, a plaintiff must prove: (1) she was a member of a protected class; (2) she was qualified for and applied for the position; (3) she was rejected; and (4) others who were not members of the protected class were hired. Laosebikan v. Coca-Cola Co., 167 Fed. Appx. 758, 761 (11th Cir. 2006) (citing E.E.O.C. v. Joe's Stone Crabs, 296 F.3d 1265, 1273 (11th Cir.2002)). The fourth element may also be established by showing that a plaintiff suffered from disparate treatment because of membership in the protected class. Apodaca, 161 Fed. Appx. at 900 (citing Kelliher v. Veneman, 313 F.3d 1270, 1275 (11th Cir.2002)).

> A plaintiff who establishes a prima facie case raises a presumption that the employer illegally discriminated against him. The employer then has the burden of articulating legitimate, nondiscriminatory reasons for the adverse employment action. If the employer fails to produce such evidence, the plaintiff is entitled to judgment. On the other hand, if the employer articulates a legitimate reason for its action, the presumption of discrimination disappears. The plaintiff must produce sufficient evidence to permit the fact-finder to conclude that the employer's stated reasons were not the real reasons for the employment decision. A plaintiff cannot prove pretext simply by showing that he was better qualified than the individual who received the position he wanted. Disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as

virtually to "jump off the page and slap you in the face."

Laosebikan, 167 Fed. Appx. at 761(citations omitted).

Plaintiff Simmons meets the first element of a prima facie case - she is a female over the age of 40. She meets the third element in that she was not selected for the promotion to HR Manager. As for the second element, she was not *as qualified* as the individuals who were offered the job. The individual selected, Holder, was far more qualified than Plaintiff. Although Plaintiff had been with the company and working in HR for 20 years, Boeing "preferred" an advanced degree and an SHRM certificate was a "plus." Holder had both and Plaintiff had neither. As to the fourth element, although Holder is a male under the age of 40, Boeing first offered the job to a female over the age of 40. Of course the fact that Boeing first offered this position to a female over 40 is not a dispositive factor. Rather, Plaintiff must show Boeing discriminated against her *because of* her age. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312-313, 116 S. Ct. 1307 (1996). When two more male individuals were not selected, the next person offered the job was a female. It was only when she turned down the offer and Holder scored higher than anyone else interviewed a second time that Holder was selected. Construing the facts in Plaintiff's favor to assume these factors are sufficient to establish a prima facie case, Plaintiff nonetheless failed to rebut the reasons given by Boeing for selecting Holder over her.

Plaintiff claims that Boeing should have given her more credit in the interview process for having more years of experience at Boeing and in HR. However, Boeing's policies state

that education is valued more highly than experience and every year of education entitles an interviewee to two years of "experience credit." Boeing has a right to interpret its rules as it chooses and to make determinations, promotions and evaluations as it sees fit because the anti-discrimination statutes only prohibit *discrimination*.   Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984) (citation omitted).

The Eleventh Circuit Court of Appeals has admonished, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [courts do] not interfere.  Rather our inquiry is limited to whether the employer gave an honest explanation of its behavior."  Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (citation omitted).  Federal courts "are not in the business of adjudging whether employment decisions are prudent or fair."  Id. (citation omitted).  "An 'employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'"  Id. (citing Nix, 738 F.2d at 1187).  Often mistaken for more than what it is, most plaintiffs fail to comprehend that the anti-discrimination statutes are not federal civility codes.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  Those laws simply do not extend to every action that makes an employee unhappy.  Davis v. Town of Lake Park, 245 F.3d 1232, 1242 (11th Cir. 2001).

Plaintiff Simmons therefore cannot prove discrimination by allegations of unfairness

or showing she disagreed with Boeing's interpretation of its guidelines and policies.  The applicable statutes and case law require Plaintiff to establish she was *discriminated against* because of her age or gender.  Plaintiff interprets the word "discriminated" to mean simply choosing someone over her.  While that may be a standard dictionary definition for the word, it is not the word's legal meaning in the context of the ADEA and Title VII.  When speaking of discrimination as proscribed by federal law, an employer is only prohibited from failing to promote someone *because of* a protected characteristic such as age, gender, race or religion.  This Plaintiff Simmons did now show.  All her evidence shows is personality conflicts, mostly with other women, that Plaintiff exaggerated into discrimination complaints. Federal law does not protect Plaintiff from gossip or personality conflicts and certainly does not require that everyone in the office like her.  Even assuming Plaintiff had satisfied the elements of a prima facie case, Defendant Boeing provided legitimate, non-discriminatory reasons for selecting Holder over Plaintiff - Holder was objectively more qualified.

### *Retaliation Claims*

This year the Supreme Court of the United States modified the standard of review for an employee's retaliation claim.  In the past, a plaintiff-employee was required to show that the adverse action she suffered at the hands of her employer actually affected a term or condition of her employment.  Now, the anti-retaliation provisions cover "those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. . . . [T]hat means that the employer's actions must be harmful to the point

that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, — U.S. —, 126 S. Ct. 2405, 2409 (June 22, 2006).

In <u>White</u>,

[Sheila] White, the only woman in her department, operated the forklift at the Tennessee Yard of petitioner Burlington Northern & Santa Fe Railway Co. (Burlington).  After she complained [of sexual harassment by her immediate supervisor, Joiner, he was disciplined], but she was removed from forklift duty to standard track laborer tasks.  She filed a complaint with the Equal Employment Opportunity Commission (EEOC), claiming that the reassignment was unlawful gender discrimination and retaliation for her complaint.  Subsequently, she was suspended without pay for insubordination. Burlington later found that she had not been insubordinate, reinstated her, and awarded her backpay for the 37 days she was suspended.  The suspension led to another EEOC retaliation charge.

<u>Id.</u> at 2406.  Joiner had repeatedly told White that women should not be working in that department and had also made insulting and inappropriate remarks to her in front of her male colleagues.  When White was removed from forklift duty, she was told that the reassignment reflected co-workers' complaints that a "more senior man" should have the "less arduous and cleaner job" of forklift operator.  <u>Id.</u> at 2409.  White claimed that the reassignment amounted to unlawful gender-based discrimination and retaliation for her earlier complaint about Joiner.

After exhausting her administrative remedies, White sued Burlington in federal court claiming that Burlington's actions in changing her job responsibilities and suspending her for 37 days amounted to unlawful retaliation under Title VII.  A jury awarded White

compensatory damages.   The Sixth Circuit affirmed holding that a plaintiff alleging retaliation must show an adverse employment action defined as a materially adverse change in the terms and conditions of employment.   Affirming, the Supreme Court set forth the background for and explained the new language to be incorporated into an analysis of a retaliation claim.

"Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Id. at 2410 (citing 42 U.S.C. § 2000e-3(a) (emphasis added).   The court then noted several traditional anti-retaliation principles that apply in every case:

- the statutes and case law require "a link between the challenged retaliatory action and the terms, conditions or status of employment;"

- it is unlawful to fail or refuse to hire or to discharge any individual with respect to her compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, gender or national origin;

- it is unlawful to limit, segregate or classify employees in a way that would deprive that employee of employment opportunities or adversely affect her status as an employee.

Id. at 2411.   The court then explained that the substantive provisions of Title VII limit its scope "to actions that affect employment or alter the conditions of the workplace.   No such

16

limiting words appear in the anti-retaliation provision." Id. at 2412. "There is strong reason to believe that Congress intended the differences that its language suggests, for the two provisions differ not only in language but in purpose as well.  The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religious, or gender-based status." Id.  "The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.  The substantive provision seeks to prevent injury to individuals based on who they are, i.e., their status.  The anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e., their conduct." Id. (citations omitted).  "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace."  Id. (citation omitted). "Interpreting the anti-retaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of the Act's primary objective depends." Id. at 2414.  "For these reasons, we conclude that Title VII's substantive provision and its anti-retaliation provision are not coterminous.  The scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.  We therefore reject the standards applied in the Courts of Appeals that have treated the anti-retaliation provision as forbidding the same conduct prohibited by the anti-discrimination provision and that have limited actionable retaliation to so-called

'ultimate employment decisions.'"  <u>Id.</u>  Although the court expanded the definition of "retaliatory discrimination," the court also explained that there are still limits to what is considered illegal "retaliation" against a complaining employee.

"The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  <u>Id.</u>  A "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  <u>Id.</u> (citation omitted).  "We speak of material adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace.'"  <u>Id.</u> at 2415 (citing <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275 (1998) (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'") (other citation omitted)).  "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."  <u>Id.</u> (citing 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed.1996) (noting that courts have held that personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable under § 704(a))).  "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's

remedial mechanisms." Id. (citation omitted).  "It does so by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers.  And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id. (citing 2 EEOC 1998 Manual § 8, p.8-13).

The court referred to the reactions of a "reasonable" employee because the standard for "harm must be objective.  An objective standard is judicially administrable.  It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.  We have emphasized the need for objective standards in other Title VII contexts, and those same concerns animate our decision here." Id. (citation omitted).  The "significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters.  'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" Id. (citation omitted).  A "change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." Id. (citation omitted).  "A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." Id. at 2415-16 (citing 2 EEOC 1998 Manual § 8, p. 8-

14).  "By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination."  Id. at 2416.

Based on the foregoing facts and standards for analyzing retaliation claims, the Supreme Court upheld the jury's findings that the reassignment of White from forklift duty to standard laborer tasks and the 37-day suspension without pay was "materially adverse." Id.  "Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." Id.  However, "reassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case."  Id. at 2417.  The court found "the jury had before it considerable evidence that the track labor duties were 'by all accounts more arduous and dirtier;' that the 'forklift operator position required more qualifications, which is an indication of prestige;' and that 'the forklift operator position was objectively considered a better job and the male employees resented White for occupying it.'"  Id. (citation omitted).  Further, "White and her family had to live for 37 days without income.  They did not know during that time whether or when White could return to work.  Many reasonable employees would find a month without a paycheck to be a serious hardship."  Id.  The jury's findings were therefore upheld.

Applying the standards from <u>White</u> to the case at bar, Plaintiff Simmons' allegations of retaliation are listed below and the Court's findings on the same follow:

(a)     After Simmons began complaining of her non-selection, her office was moved over her objection to a less desirable location in a trailer.

*Plaintiff was moved in response to her complaint that her location lacked privacy. Further, all of Plaintiff's internal customers worked in Building One and Plaintiff needed to work near them. A security manager and HRG Stephanie Brock also moved to the trailer until Brock requested to move back into Building One because Plaintiff made the working conditions in the office intolerable, particularly considering that Brock's internal customers refused to meet with her if Plaintiff was there.*

(b)     Simmons' performance evaluations have been the lowest of her career and she has for the first time in her career received ratings that she did not meet expectations. Simmons is the most experienced human resource generalist at the Boeing facility in Macon but is now rated as the lowest performing one.

*In his position as the new HR Manager, Holder was better able to assess the performance of each individual HRG and for the first time graded Plaintiff as an individual and not based on her former role as Team Leader. Plaintiff is the only Level 5 HRG at the Boeing facility in Macon and is paid substantially more than the other HRGs. Likewise, the expectations for her performance*

*are higher. Plaintiff's only evidence that her review was retaliatory is her own belief about the adequacy of her performance and her belief that she should receive the same scores as in previous years.*

(c)   According to Simmons' job assignment as a Level 5 HRG, she should be consulting with executive management at Boeing but she has not been allowed to carry out this responsibility, unlike other human resources personnel who are actually lower ranked than Simmons.

*Plaintiff by her own choice was no longer a Team Lead and had a new level of management between her and her senior manager. Her new manager, Holder, would therefore naturally participate in many of the upper-level meetings instead of Plaintiff. Moreover, Plaintiff has offered nothing beyond her assumptions and speculations that any other HRGs participated to a greater extent than she did in meetings with senior management.*

(d)   Several of her most significant job responsibilities have been removed from her. These include the Cash Awards and Special Incentive Programs, Redeployment (layoff) Focal and compensation analysis. Process Based Management was also removed from Simmons for a period of time.

*Holder was unaware that Plaintiff complained of discrimination at the time he took over the Cash Awards and Incentive Program. Further, Holder believed that these responsibilities should be handled by him as the manager.*

22

*Compensation analysis was moved to a Center for Excellence – a move that took place company-wide.*

(e)     Boeing took away Plaintiff's authority to sign promotions and compensation changes.

*As a result of the creation of the new management position and pursuant to Boeing policy, Holder took over the responsibility of signing promotions. Compensation duties were taken over by the CFE as part of the company-wide change in duties.*

(f)     Plaintiff Simmons has been excluded from meetings with Boeing managers assigned as her internal "customers."

*Plaintiff presented no evidence that this actually occurred, and certainly did not produce any evidence that if she was kept out of any meetings it was "retaliation" for any complaints of alleged discrimination. Plaintiff was unable to describe the substance of any such meetings and admitted that she was never denied access to her internal customers.*

(g)     Plaintiff's phone calls to Boeing managers regarding human resources matters have been returned less frequently than before she complained.

*Quite possibly the most frivolous claim Plaintiff asserted, this allegation amounts to nothing more than petty bickering over office procedures. Again, Plaintiff offered no specifics to support the allegation such as how many calls*

23

*she made and received prior to her complaints compared to how many she made and received after the complaints. She did not provide any evidence that the managers who allegedly failed to return her calls were even aware that she had engaged in the "protected activity" of making discrimination complaints. Further, some of the managers Plaintiff supported had complained to Holder and Bennett about their difficulty in working with Plaintiff. Plaintiff failed to show that her purported protected activity, as opposed to issues with her approachability and inability to get along well with others, caused managers to avoid her.*

(h)     Plaintiff has volunteered for boards and committees such as a company-wide Human Resources Skills Team but has been rejected.

*Plaintiff named one committee that she was not selected to fill. Not being assigned to one particular committee is not a materially adverse action under White, supra, because it is not something a reasonable employee would feel materially harms their position within the company.*

(i)     Plaintiff's emails to Boeing managers have frequently been deleted without being read.

*As with the phone call issue, Plaintiff again makes a frivolous complaint that has no possibility of being analyzed on an objective level. Even accepting that Plaintiff's claim is true, Plaintiff presented no evidence that any managers*

*who allegedly deleted her e-mails knew of her "protected activity" or that they were motivated by such activity.  For example, Plaintiff testified that she had reported one of her customers, Keith Castleberry, for "unethical behavior" – she claimed he was dishonest when he complained about her to Bennett while telling Plaintiff that she was doing a good job.  Plaintiff claimed that Mr. Castleberry deleted e-mails she sent without reading them because he was displeased that she had accused him of dishonesty.  This claim is unrelated to any complaint about alleged discrimination.*

(j)   The percentage raises received by Plaintiff Simmons have been lower than those of any other HRGs at the Boeing facility in Macon.

*Plaintiff's pay increases were based on the areas of her performance in which she needed to improve - thus an objective, non-discriminatory basis. Moreover, Plaintiff received a higher pay increase than two of the other four HRGs.*

(k)   Plaintiff was not allowed to serve as acting human resources manager in the absence of other human resources managers.

*Boeing added an additional layer of management between Plaintiff and the Senior HR Manager Bennett.  There was less of a need to have an acting manager when Bennett was out.  Plaintiff presented no evidence that other HRGs were allowed to serve as the acting human resources manager*

*following that change while she was not.*

(l)     Simmons has been criticized for her appearance and body language.

*Several people stated that Plaintiff frequently rolled her eyes and crossed her arms in meetings particularly when other employees received awards or other types of recognition.  Plaintiff's customers and other HRGs also complained to Bennett and Holder that they considered Plaintiff to be cold and unapproachable.  Plaintiff's managers gave her constructive criticism regarding her body language to help improve Plaintiff's relationship with her customers and fellow HRGs.  Plaintiff presented no evidence that the reasons for this constructive criticism were based on complaints of discrimination.*

(m)    Plaintiff's work has been scrutinized much more closely than it was previously and much more closely than the work of other HRGs.

*On the few occasions that he did so, Holder scrutinized Plaintiff's work more closely until he became confident that she was handling matters competently and appropriately.  Further, Plaintiff does not know the extent to which Mr. Holder scrutinized other HRGs' work and Holder testified that he closely scrutinized every HRGs work for a while after he moved into the position.*

(n)     Plaintiff has been accused of failing to help clean up a conference room when she was unable to help due to an extraordinarily heavy work load at that time and due to the relocation of her office to a trailer that was approximately five

miles away from the conference room.

*Plaintiff has again exaggerated routine office matters.  Holder admonished Plaintiff for not helping remove files, including those belonging to Plaintiff, in a conference room that Boeing needed to use for other purposes.  It is undisputed that Plaintiff did not help clean up the room and that the rest of the HR team did.  Thus, there is no evidence that this criticism was based on retaliation.*

(o)    Bennett falsely accused Plaintiff of never apologizing.

*Plaintiff again exaggerates an issue that does not constitute a materially adverse action.  Plaintiff failed to present any evidence that Bennett's criticism was motivated by anything other than a belief that Plaintiff does not accept responsibility for her actions.*

(p)    Plaintiff has been criticized by her managers, Holder and Bennett, in front of other Boeing employees.

*Plaintiff failed to show how any instance of particular criticism was given when it was not warranted or that it was given in a harassing or retaliatory manner.*

(q)    Other HRGs have had serious issues with their performance but received positive performance evaluations.  On the other hand, since Plaintiff Simmons began complaining, all criticisms of her have been allowed to negatively

influence her performance evaluations.

*Plaintiff offered nothing more than her own personal opinion that other HRGs had "serious issues in their employment." The HRGs were managed by Bennett and Holder not Plaintiff. Moreover, as a higher-paid, higher-level HRG, Plaintiff's performance should have been at a higher level particularly considering her salary increases were based partly on her performance.*

(r) Plaintiff has been falsely criticized by management and her performance has been downgraded for allegedly crossing her arms and rolling her eyes in meetings.

*See above regarding her managers' criticisms pertaining to her mannerisms and body language.*

Plaintiff Simmons presented no evidence whatsoever that Defendant Boeing violated Title VII's or the ADEA's anti-retaliation provisions which prohibit employers from "discriminating against" an employee because she has "opposed" a practice *that Title VII forbids.* Every single complaint Plaintiff made pertained to bickering, personality conflicts, Plaintiff's unapproachable demeanor toward her coworkers, her inability to accept that a manager was placed over her and her extreme sensitivity to any negative feedback whatsoever. Plaintiff certainly did not make a showing of a link between the alleged retaliatory actions and the terms, conditions or status of her employment. There is not one bit of evidence that Boeing interfered with Plaintiff's efforts to "secure or advance

28

enforcement" of the anti-discrimination laws. In fact, the record is replete with evidence that Boeing managers at every level took extraordinary steps to investigate every single one of Plaintiff's frequent complaints. Every one of her insubordinate, unprofessional emails to Holder were answered with courteous and thorough responses. Her formal complaints were investigated as shown in the investigation documents. No Boeing employee effectively retaliated against Plaintiff by taking actions that would have dissuaded a reasonable employee from making or supporting a charge of discrimination.

The anti-retaliation laws do not protect Plaintiff Simmons from all retaliation but from retaliation that produces an injury or harm. Plaintiff's arguments failed to separate significant from trivial harms and personality conflicts. Title VII does not set forth a general civility code for Boeing employees. This case involves nothing more than the ordinary tribulations of the workplace. Plaintiff's decision to report what she perceived as discriminatory behavior does not immunize her from petty slights, snubbing, her perception of a lack of good manners or other minor annoyances that often take place at work and that all employees experience. Further, Plaintiff was never prevented from doing anything to further her career at Boeing, or anywhere else. To the contrary, she was told on a number of occasions that she needed to obtain a college degree and otherwise further her education so that she could advance at Boeing. There is no evidence that anyone at Boeing did anything to prohibit Plaintiff from doing just that. Nor was Plaintiff ever assigned duties that were more arduous or that carried less prestige than any of her coworkers. Plaintiff's

assignments fit squarely within Boeing's legitimate, objective corporate policies.  Unlike the plaintiff in <u>White</u>, Plaintiff Simmons was certainly never suspended without pay for an indefinite period of time nor was she subjected to any other similar form of hardship.

Plaintiff's only evidence of discrimination or retaliation are her own personal opinions about how Boeing should make assignments and carry out the promotional process, both of which are clearly within Boeing's discretion to make and not within this Court's jurisdiction considering the complete lack of any indicia of discrimination.  Plaintiff's opinion that she was more qualified than Holder is simply that - her personal opinion.  Plaintiff's belief that she does not need a supervisor is immaterial considering Boeing is at liberty to make its own corporate policies without this Court's interference.  This Court certainly is not in the position to order that all employees at Boeing behave toward Plaintiff in the manner she thinks most appropriate or pleasant.  Plaintiff presented no evidence whatsoever that she was discriminated against based on her gender or her age or that any action taken by any Boeing employee or her failure to receive the promotion was based on illegal retaliation.

Defendant's motion for summary judgment is GRANTED and judgment shall be entered in its favor.

**SO ORDERED this 14th day of September, 2006.**


**S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**